IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

JOSEPH J. L., JR.,[1]  )
 )
      Plaintiff, )
 )
vs. ) Case No. 18-cv-2078-DGW[2]
 )
COMMISSIONER of SOCIAL )
SECURITY, )
 )
      Defendant. )

## **MEMORANDUM and ORDER**

**WILKERSON, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff, represented by counsel, seeks judicial review of the final agency decision denying his application for Disability Insurance Benefits (DIB) and Supplemental Income Security (SSI) benefits pursuant to 42 U.S.C. § 423.

## **Procedural History**

Plaintiff applied for disability benefits in September and October 2014, alleging disability as of October 15, 2007. After holding an evidentiary hearing, an ALJ denied the application on November 7, 2017. (Tr. 15-30). The Appeals Council denied review, and the decision of the ALJ became the final agency

---

[1] In keeping with the court's recently adopted practice, plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. See, Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c). See, Docs. 10 & 20.

decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1. Did the ALJ err by independently crafting his own RFC after effectively rejecting every medical opinion of record?

2. Did the ALJ err by impermissibly playing doctor and interpreting medical evidence in the course of formulating his RFC determination?

3. Did the ALJ err in his analysis of Dr. Workman's opinion?

4. Did the ALJ err by omitting important evidence and, relatedly, failing to consider the combined effect of plaintiff's impairments?

## Applicable Legal Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[3] Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a plaintiff is disabled, the ALJ considers the following five questions in order: (1) Is the plaintiff presently unemployed? (2) Does the

---

[3] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

plaintiff have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the plaintiff unable to perform her former occupation? and (5) Is the plaintiff unable to perform any other work?   20 C.F.R. § 404.1520.

An affirmative answer at either step three or step five leads to a finding that the plaintiff is disabled.  A negative answer at any step, other than at step three, precludes a finding of disability.  The plaintiff bears the burden of proof at steps one through four.  Once the plaintiff shows an inability to perform past work, the burden then shifts to the Commissioner to show that there are jobs existing in significant numbers in the national economy which plaintiff can perform. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.  It is important to recognize that the scope of review is limited.  "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g).  Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.  *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).   This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154

(2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.  *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019).  However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.  See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## **The Decision of the ALJ**

The ALJ followed the five-step analytical framework described above.  He determined that plaintiff had not worked at the level of substantial gainful activity since the alleged onset date.  He was insured for DIB only through September 30, 2009.

The ALJ found that, prior to the date last insured, plaintiff had no severe impairments.  Since the date in October 2014 when he filed his claim for SSI, plaintiff had severe impairments of degenerative disc disease; osteoarthritis affecting the right foot, ankle, knee, hand, hips, and shoulders; coronary artery disease with arrhythmia, hypertension, and hyperlipidemia; diabetes with neuropathy; level one obesity; carpal tunnel syndrome; and headaches.

The ALJ found that plaintiff had the residual functional capacity (RFC) to perform work at the sedentary exertional level limited to standing/walking for a total of two hours a day; frequent reaching, handling, and fingering bilaterally; no

climbing of ladders, ropes, or scaffolds; occasional climbing of stairs and ramps; and occasional stooping, kneeling, crouching, and crawling. Based on the testimony of a vocational expert, the ALJ concluded that plaintiff was not able to do his past work as a material handler or automobile mechanic, but he was able to do other jobs that exist in significant numbers in the national economy.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to plaintiff's argument.

### 1. Agency Forms

Plaintiff was born in 1975. He was 42 years old on the date of the ALJ's decision. A prior claim had been denied in November 2014. (Tr. 244-245).

In a Function Report submitted in January 2015, plaintiff said he could not work because he could not sit or stand for a long time and could "barely walk." He could not put his hands above his head. He had "severe pain" in his neck, shoulders, and legs, and had headaches. (Tr. 265).

### 2. Evidentiary Hearing

Plaintiff was represented by an attorney at the evidentiary hearing in June 2017. (Tr. 40).

Plaintiff testified that, since 2014, he had been unable to work because of pain in his low back, right knee, neck, hips, and legs, and diabetic neuropathy.

(Tr. 57). He had eight heart stents placed because of cardiac problems. (Tr. 59). He used a motorized wheelchair. He was told that he needs a knee replacement but cannot have the surgery because his cardiologist will not take him off blood-thinner. (Tr. 62-63). He only uses the chair in the house because his house does not have a ramp. (Tr. 68).

### 3. Relevant Medical Records

Plaintiff first saw his primary care physician, Dr. Workman, in July 2014. He gave a history of a motor vehicle accident years earlier and complained of low back pain. Dr. Workman ordered a lumbar MRI. (Tr. 964-966). It was done in August 2014, and showed no abnormalities at T12-L1, L1-2, L2-3, and L3-4. There was mild facet arthropathy at T11-12; minimal concentric bulge and mild facet arthropathy at L4-5 that caused moderate narrowing at the opening to each foraminal opening; contact of the left L4 nerve root with the disc bulge near the lateral border of the foramen; and minimal concentric bulge and mild facet arthropathy at L5-S1 causing mild left foraminal narrowing. (Tr 639).

Plaintiff has coronary artery disease. From March 2015 through February 2017, he had three cardiac catheterization procedures with placement of eight drug-eluting stents.[4] He was treated by River to River Heart Group during that time. (Tr. 1331-1366). Dr. Al-Badarin, a cardiologist with another group, saw

---

[4] "Stents are small mesh tubes inserted to keep arteries open after a procedure called angioplasty (percutaneous coronary intervention, or PCI). Drug-eluting stents have a polymer coating over mesh that emits a drug over time to help keep the blockage from coming back." https://www.mayoclinic.org/diseases-conditions/coronary-artery-disease/in-depth/drug-eluting-stents/art-20044911, visited on August 13, 2019.

him in February 2017, after the placement of the last stent. Plaintiff was still feeling unwell with persistent chest pain on exertion. Dr. Al-Badarin started him on a low-dose nitroglycerin drip. (Tr. 2425-2429). In March 2017, Dr. Al-Badarin noted that plaintiff's symptoms appear to be "nontypical," but plaintiff was worried about coronary artery disease and ischemia. The doctor reassured him that "with a negative myocardial perfusion imaging scan, his outlook is well overall, but he continued to be worried." He was on "dual antiplatelet therapy," consisting of Effient and aspirin. (Tr. 2436-2437). Dr. Al-Badarin did a diagnostic cardiac catherization in April 2017 and recommended fractional flow reserve evaluation of a lesion in the mid-right coronary artery. This procedure was done, and the impression was that plaintiff was "a candidate for medical therapy and risk factor modification." (Tr. 2441-2445).

Several doctors at the Orthopedic Institute of Southern Illinois treated plaintiff. Dr. Treg Brown saw him for right knee pain in January 2016. An MRI showed a complex tear of the lateral meniscus and very early tricompartmental osteoarthritis. (Tr. 1794-1795). Dr. Brown did an arthroscopic lateral meniscectomy with debridement of chondromalacia. In June 2016, about two and a half months later, plaintiff still had pain and a feeling of "something catching in the knee." Dr. Brown explained to him that he had primary osteoarthritis of the lateral compartment and absence of most of his lateral meniscus, and therefore "he may always have lateral-based knee pain." (Tr. 1800-1801). Dr. Brown did a right knee arthroscopy with revision meniscectomy and debridement of

chondromalacia. In September 2016, three weeks after the surgery, plaintiff continued to complain of pain and some catching in the knee. He was sometimes using a cane for ambulation. He also complained of severe back pain. Dr. Brown felt he had mild primary osteoarthritis of the right knee and there was nothing further they could do. He advised him to follow up with the doctor who was treating his back pain because he did not feel that "the low level of arthritis present would cause the level of symptoms he is describing." (Tr. 1809-1811).

Dr. Richard Morgan, who also practiced at the Orthopedic Institute of Southern Illinois, saw plaintiff at Dr. Brown's request in October 2016 for right knee pain. Dr. Morgan diagnosed primary arthritis of the right knee and "told [plaintiff] about a knee replacement and an injection." He recommended an injection because of plaintiff's age. (Tr. 1812-1814). Dr. Morgan also saw him for arthritis in his right shoulder and recommended a distal clavicular resection and subacromial decompression. While they were waiting for medical and cardiac clearance for surgery, plaintiff called and said that surgery had to be delayed because some of his heart stents had clogged up and had to be reopened. In March 2017, plaintiff said that he had just had an eighth stent put in. He was taking blood thinners. He said that Dr. Al-Badarin said that "he wouldn't clear him even to have a tooth pulled." (Tr. 1817-1819).

Plaintiff continued to periodically complain to Dr. Workman of low back pain throughout the period in issue. Dr. Workman prescribed Norco. His office notes contain few objective exam findings about plaintiff's low back. In March 2017, his

weight was up to 272 pounds. He complained of increased back pain and asked about a referral to pain management. That is the last office visit with Dr. Workman. See, Tr. 2215-2302. Dr. Workman referred plaintiff to Pain Management of Paducah at that visit for persistent low back and neck pain. (Tr. 2339). There are no records from Pain Management of Paducah in the transcript.

Plaintiff was also seen by a rheumatologist, Dr. Jarugula. In January 2017, plaintiff complained of "joint pain all over." Dr. Jarugula concluded that the etiology of his pain was unclear and that his pain was "out of proportion to his physical findings." His ANA inflammatory markers and CCP had been negative. She ordered a rheumatoid factor quantitative test. This was negative. Plaintiff called her office in May 2017, complaining that his hands were painful and "curling in." She assured him there was "no concern for inflammatory arthritis or significant OA of his hands based on previous workup." She offered to see him in the office on an urgent basis, but he declined because he could not get to Carbondale. She recommended that he increase his dosage of Gabapentin. (Tr. 2451-2459).

A lumbar MRI was done on May 15, 2017. It was ordered by Dr. Workman. The radiologist had the August 2014 MRI for comparison. The 2017 MRI showed "advanced degenerative disc change with a broad-based bulge with an annular fissure with disc desiccation and very advanced facet and ligamentous hypertrophy" at L4-5. There was also moderate neural foraminal stenosis at L4 on the right, and "very severe" neural foraminal stenosis at L4 on the left. At L5, there was

moderate neural foraminal stenosis on the right, and "severe" neural foraminal stenosis on the left. There were also findings of mild to moderate disc desiccation and facet and ligamentous hypertrophy at L1-2, L2-3, and L3-4. (Tr. 2474-2476).

### 4. Medical Opinions

State agency consultants assessed plaintiff's RFC based on a review of the records in March and October 2015. (Tr. 95-97, 120-122). The first assessment was that he was capable of medium exertion work. The second was that he could do only light exertion work.

In February 2017, Dr. Workman assessed severe limitations based largely on a "fit for work" evaluation that had been done by a physical therapist. (Tr. 2496-2505).

Dr. Jarugula assessed plaintiff's RFC in January 2017. Most of her answers were qualified by phrases such as "hard to know" and "hard to say." (Tr. 2493-2495).

## Analysis

Plaintiff's first two points are related in that they focus on the 2017 lumbar MRI.

He first argues that the ALJ erred by rejecting every medical opinion in the record and instead crafting his own medical opinion regarding plaintiff's RFC. His second point is that the ALJ erred in determining for himself the significance of the 2017 MRI results.

To the extent that plaintiff's first point argues that the ALJ erred by crafting his own RFC rather than relying on one of the medical opinions, the first point is rejected. Plaintiff cites *Suide v. Astrue*, 371 F. Appx. 684 (7th Cir. 2010), but *Suide* does not stand for the proposition that an ALJ's RFC assessment must rest upon a healthcare provider's opinion. The rule is, in fact, to the contrary. The ALJ "must consider the entire record, but the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions. . . ." *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007). The determination of RFC is an administrative finding that is reserved to the Commissioner. 20 C.F.R. §404.1527(d)(2). The error in *Suide* was not that the ALJ did not rely on a doctor's opinion to assess RFC; rather, the error was that the ALJ failed to discuss significant medical evidence in the record. *Suide*, 371 Fed.Appx. at 690. In addition, *Suide* is not precedential authority.

Plaintiff is on firmer ground where he argues in both points that the ALJ erred by interpreting the 2017 lumbar MRI himself. The ALJ said he gave only "little weight" to the state agency assessments, "because evidence presented at the hearing a level, a more recent lumbar MRI, suggests the claimant would have a more restrictive functional capacity, but not more restrictive than sedentary." (Tr 27).

There are obvious differences between the 2014 and 2017 MRIs. The first study showed no abnormalities at T12-L1, L1-2, L2-3, and L3-4; mild facet arthropathy at T11-12; minimal concentric bulge and mild facet arthropathy at

L4-5 that caused moderate narrowing at the opening to each foraminal opening; contact of the left L4 nerve root with the disc bulge near the lateral border of the foramen; and minimal concentric bulge and mild facet arthropathy at L5-S1 causing mild left foraminal narrowing. (Tr 639). The 2017 MRI showed "advanced degenerative disc change with a broad-based bulge with an annular fissure with disc desiccation and very advanced facet and ligamentous hypertrophy" at L4-5; moderate neural foraminal stenosis at L4 on the right, and "very severe" neural foraminal stenosis at L4 on the left; at L5, moderate neural foraminal stenosis on the right, and "severe" neural foraminal stenosis on the left; and mild to moderate disc desiccation and facet and ligamentous hypertrophy at L1-2, L2-3, and L3-4. (Tr. 2474-2476).

The ALJ and the Commissioner are not medical experts qualified to interpret radiology reports. "ALJs must rely on expert opinions instead of determining the significance of particular medical findings themselves." *Lambert v. Berryhill*, 896 F.3d 768, 774 (7th Cir. 2018). In two recent cases, the Seventh Circuit has held that the ALJ erred in determining for himself the significance of MRI results, rather than seeking the opinion of a medical expert. *Akin v. Berryhill*, 887 F.3d 314, 318 (7th Cir. 2018); *McHenry v. Berryhill*, 911 F.3d 866, 871 (7th Cir. 2018). *Akin* is particularly applicable; "But, without an expert opinion interpreting the MRI results in the record, the ALJ was not qualified to conclude that the MRI results were 'consistent' with his assessment." *Akin*, 887 F.3d at 317.

Of course, this Court is not a medical expert qualified to determine the

significance of radiology reports either, and the above discussion of the reports is not intended to suggest otherwise.

The Commissioner argues that the ALJ "accurately summarized the May 2017 MRI report." Doc. 27, p. 5. This argument misses the point. It was error for the ALJ to determine for himself that the 2017 MRI shows that plaintiff is capable of sedentary work. Without the input of a medical expert, the ALJ's conclusion is not supported by the record.

Plaintiff's third point regarding Dr. Workman's opinion is not well-taken.

The ALJ was not required to fully credit Dr. Workman's opinion because of his status as a treating doctor; "while the treating physician's opinion is important, it is not the final word on a claimant's disability." *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996) (internal citation omitted). A treating source's medical opinion is entitled to controlling weight only where it is supported by medical findings and is not inconsistent with other substantial evidence in the record. *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016), citing *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000).

Plaintiff's application was filed before March 27, 2017. The applicable regulation, 20 C.F.R. § 404.1527(c)(2), provides, in part:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. <u>If we find that a treating</u>

> source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. [Emphasis added]

If the ALJ decides not to give the opinion controlling weight, he is to weigh it applying the factors set forth in § 404.1527(c)(1)-(6). Supportability and consistency are two important factors to be considered in weighing medical opinions. In a nutshell, "[t]he regulations state that an ALJ must give a treating physician's opinion controlling weight if two conditions are met: (1) the opinion is supported by 'medically acceptable clinical and laboratory diagnostic techniques [,]' and (2) it is 'not inconsistent' with substantial evidence in the record." *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010).

Here, the ALJ gave little weight to Dr. Workman's opinion because it was based largely on the "fit for work" exam, but he found that exam unreliable because it did not use a known functional capacity analysis protocol, it had no validity indicator, it was brief, and the conclusions were based on very few factors. In addition, there was a discrepancy in the report regarding the amount of weight plaintiff could lift. And, the ALJ pointed out that Dr. Workman's office notes showed mostly normal findings. (Tr. 27).

Considering the deferential standard of judicial review, the ALJ is required only to "minimally articulate" his reasons for accepting or rejecting evidence, a standard which the Seventh Circuit has characterized as "lax." *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008); *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir.

2008). The Court finds that the ALJ easily met the minimal articulation standard here. Plaintiff disagrees with the ALJ's reasoning, but his reasons were articulated and are supported by the record. Plaintiff's argument is an invitation to the Court to reweigh the evidence.

Lastly, plaintiff's fourth argument fails because it is based in large part on his own testimony, and he has not challenged the ALJ's credibility determination.

The ALJ 's error with regard to the 2017 MRI requires remand. An ALJ's decision must be supported by substantial evidence, and the ALJ's discussion of the evidence must be sufficient to "provide a 'logical bridge' between the evidence and his conclusions." *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009), internal citations omitted. The Court must conclude that the ALJ failed to build the requisite logical bridge here. Remand is required where, as here, the decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review." *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012).

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that plaintiff was disabled during the relevant period or that he should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying plaintiff's application for social

security disability benefits is **REVERSED and REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE:   August 16, 2019.**

**DONALD G. WILKERSON
UNITED STATES MAGISTRATE JUDGE**